**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD PHILLIPS and** | ) | |
| **DEDA PHILLIPS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 04-0634-CG-B** |
| | ) | |
| **AMERICAN HONDA MOTOR CO., INC.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on the motions of defendants, American Honda Motor Co., Inc., Honda Motor Co., Ltd., Honda R&D Americas, Inc., Honda of America Mfg., Inc., and Honda North America, Inc., for summary judgment (Doc. 124), to strike the testimony of Dr. Judy Cooke Travis, Dr. Donald Charles Gross, Dr. William Debell, Dr. Thomas D. McDermott, and Don Sprewell (Doc. 141), to exclude the testimony of Michael A. Burleson (Doc. 143), to strike plaintiffs' evidentiary submissions (Doc. 146), and to strike plaintiffs' statements of disputed fact (Doc. 147), plaintiffs' responses to the above motions, (Docs. 135, 149, 150, 151, 154), and defendants' replies (Docs. 140, 155, 156, 157, 163). For the reasons stated below, defendants' motions to strike expert testimony are due to be GRANTED, defendants' motion to strike plaintiffs' evidentiary submissions are due to be GRANTED IN PART and DENIED IN PART, defendants' motion to strike plaintiffs' statement of disputed facts is MOOT, and defendants' motion for summary judgment is due to be GRANTED.

1

**BACKGROUND**

This case arises from injuries plaintiff Richard Phillips alleges he sustained while riding and operating a 1998 Honda TRX-300 Four-Wheeler. (Complaint).  Specifically, plaintiff alleges that he sustained serious burns to his feet from exposure to unsafe temperatures generated by the four-wheeler.   Plaintiff had previously been diagnosed with type 2 diabetes and sustained peripheral neuropathy resulting in the loss of sensation in his feet and ankles. (Phillips Depo. pp. 104-06, 114-116).  Plaintiff also had experienced complications from diabetic neuropathy.  For instance, he suffered an ulcer on his left heel from wearing rubber boots while hunting. (Krauss Depo. p. 32-34). He had also had problems with cuts, ulcers and/or blisters on his feet, and had endured several surgeries and the removal of at least two toes and additional bone as a result. (Phillips Depo. pp. 110-113,  123-125, Krauss Depo. pp. 26-83).

On September 7, 2001, plaintiff borrowed the ATV in question from a friend in order to mow a field by pulling a GT42 Bush Hog mower behind the ATV. (Phillips Depo. pp. 95-96). Mr. Phillips was aware that the engine of an ATV is hot, but he has considerable experience riding ATVs and had never been burned before. (Philips Depo. pp. 77-78, 91-92, 95-96).  On September 7, 2001, plaintiff operated the ATV for about an hour and a half. (Phillips Depo. p. 151).  That evening, plaintiff noticed some sores on his feet. (Phillips Depo. p. 166-70).

**LEGAL ANALYSIS**

**I. Treating Physicians**: **Dr. Judy Cooke Travis, Dr. Donald Charles Gross, Dr. William Debell, Dr. Thomas D. McDermott, and Don Sprewell**

Defendants seek to strike the testimony of plaintiff's treating physicians and treating

2

physical therapist primarily because they were not timely identified as expert witnesses.  The scheduling order required plaintiffs to disclose expert testimony as required by Fed.R.Civ.P. 26(a)(2) on or before June 30, 2005. (Doc. 33).   However, as plaintiffs correctly argue, treating physicians are not treated as experts to the extent their testimony is based on observations during the course of treatment unless their testimony was acquired or developed in anticipation of litigation or for trial. Brown v. Best Foods, A Division of CPC Intern., Inc., 169 F.R.D. 385, 387 (N.D. Ala. 1996) (quoting Richardson v. Consolidated Rail Corp., 17 F.3d 213, 218 (7th Cir.1994)).   However, as fact witnesses, their opinions must be based on facts of which they have personal knowledge. Id.   In addition, testimony regarding causation will not be allowed unless the determination of causation was necessary for treatment and their opinions are helpful to a clear understanding of the witnesses' testimony. U.S. v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (citations omitted).  If the physicians and physical therapist, testifying as fact witnesses, did not need to determine how plaintiff was injured to administer treatment, then their testimony concerning causation is inadmissable.

The testimony from these witnesses indicates that their conclusions that plaintiff was burned was based not on personal knowledge acquired from their observations, but from what plaintiff had told them.  These witnesses testified that the injury was consistent with a burn, but that does not rule out the possibility that there was a different cause.  Plaintiff had endured similar injuries to his feet in the past that were not burns.  Dr. Krauss even testified, when presented with photos of the injuries to plaintiff's feet, that the injuries appeared to be "heel ulcerations" similar to ulcerations plaintiff had been treated for in the past. (Krauss depo. p. 19). The testimony indicates that the treating physical therapist and doctors did not diagnose

plaintiff's condition, but were merely treating him according to Dr. Travis's initial conclusions.

Travis's conclusions were based not on his personal knowledge and observation, but on

plaintiff's own account of what happened.  Cumulatively, the testimony does not indicate that

the treating professionals determined from their observations that the injuries were burns or that

such a determination impacted the treatment that was administered or prescribed.

      Plaintiffs contend that they timely disclosed their intent to use the treating physicians as

expert witnesses in their response to defendants' first set of interrogatories.  On April 14, 2004,

in response to defendants' interrogatory request for the identity of each and every expert

plaintiffs intend to call to testify, plaintiffs stated the following:

> In response to this interrogatory Plaintiff states that discovery has just begun and
> is ongoing at the present time and therefore the information necessary to respond
> to this interrogatory completely is not available.  The Plaintiff reserves the right to
> supplement this answer once discovery has been completed.  My attorney has not
> determined at this time who will testify as an expert at the trial of this case.  This
> response will be supplemented in compliance with the Court's general pretrial
> order.  It is anticipated that the Plaintiff will or may call as experts all physicians,
> nurses, rehabilitation counselors, vocational counselors, or other medical or
> professional personnel who have treated and/or evaluated the Plaintiff as a result
> of the incident made the basis of this suit and the injuries sustained by the
> Plaintiff therein.

(Doc. 123-3, Interrogatory No. 9).  While the above response indicates that plaintiffs may decide

to call treating physicians as experts, it also indicates that plaintiffs had not yet made that

determination and that they would identify their experts in a supplement.  On June 30, 2005, the

deadline for plaintiffs' expert disclosures, plaintiffs responded to another interrogatory which

asked plaintiffs to identify expert witnesses as well as provide the subject matter on which they

are expected to testify.  Plaintiffs' response did not identify any experts, but, instead, merely

stated that plaintiffs "reserve the right to supplement this response in accordance with the

Court's Scheduling Order."[1] (Doc. 155, Ex. 1, Interrogatory No. 7).  On that same date, plaintiffs

filed their expert disclosure for Michael A Burleson, P.E., CSP, and W. Patton Culbertson, Ph.D.

(Doc. 61).  Also, at the deposition of Dr. Judy Cooke Travis, plaintiffs' counsel indicated that

Dr. Travis was being deposed as a treating physician rather than as an expert. (Doc. 155, Travis

Demo. p. 11).  After due consideration, the court finds that plaintiffs did not properly identify the

expert testimony of Dr. Judy Cooke Travis, Dr. Donald Gross, Dr. William Debell, Dr. Thomas

D. McDermott, or Don Sprewell.  Therefore, as discussed above, these witnesses may only offer

factual testimony of which they have personal knowledge.  As lay witnesses, their testimony

regarding causation is due to be stricken because it is not based on personal knowledge and the

determination of causation was not necessary for treatment or helpful to a clear understanding of

the witnesses' testimony.

    In addition, defendants contend that the testimony and exhibits of Dr. Travis should be

stricken as unreliable.  At her deposition, Dr. Travis stated that she does not remember some of

the details of plaintiffs' visit to her house the night plaintiff allegedly injured his feet on the

ATV.  She did not see plaintiff at her office and, thus, had no records to rely on.  When asked her

opinion as to whether the injury could have been something other than a burn, she responded as

follows:

> I think it was – it pretty much looked like a burn to me.  It didn't look like
> anything else.

Dr. Travis was unsure about some answers because she did not have the history from plaintiff's

other doctors' offices.  The court notes that Dr. Travis is also not an endocrinologist or an expert

---

[1]The scheduling order required disclosure of plaintiffs' experts on or before June 30,
2005.  (Doc. 28).

in burns and did not follow Mr. Phillips' treatment as that "would have been out of [her] realm."
(Travis Demo p. 58-59, 63).   Dr. Travis also stated that she had "[n]ot a clue" how fast it takes a
person to burn at different temperatures. (Travis Demo. p. 31).   As such, the court finds her
testimony is too unreliable to be allowed as expert testimony on the issue of causation of the
injury and is due to be stricken on this basis, in addition to the basis discussed above regarding
the failure to disclose Travis as an expert witness.   However, the court finds Dr. Travis's lay
factual testimony to be admissible.   Dr. Travis's lay testimony is not subject to the same
<u>Daubert</u> scrutiny as her expert testimony.[2]


**II. Michael A Burleson**

Defendants object to the testimony of Michael A. Burleson because they contend that the
methods used by Mr. Burleson in his tests are flawed and his conclusions are unreliable.   The
Supreme Court, in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), found
that scientific expert testimony is admissible only if the proffered testimony is both relevant and
reliable.   "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting
such testimony after receiving satisfactory evidence of its reliability." <u>Dhillon v. Crown
Controls Corporation</u>, 269 F.3d 865, 869 (7th Cir. 2001); <u>see also</u> <u>U.S. v. Majors</u>, 196 F.3d 1206,
1215 (11th Cir. 1999).  Under rule 702, "this Court has an obligation to screen expert testimony
to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application
of the methodology to the facts."  <u>Whatley v. Merit Distribution Services</u>, 166 F.Supp.2d 1350,

---

[2] <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), discussed
below with regard to the expert testimony of Michael A. Burleson.

1353 (S.D. Ala. 2001) (citations omitted).

> The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." [Daubert,] 509 U.S. [579] at 590, 113 S.Ct. 2786. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, [ ] the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592, 113 S.Ct. 2786.

Kumho Tire Co., Ltd. v. Carmichael,  526 U.S. 137, 149, 119 S.Ct. 1167, 1175 (1999).

Tests were performed on three separate days by Mr. Burleson or under his direction.  The first was a preliminary test, performed on the ATV in question by Mr. Burleson.   This preliminary test was not performed according to any written protocol and entailed the use of instruments that were not calibrated or tested in any way. (Burleson Depo. pp. 94-95).  Mr. Burleson purchased electronic thermometers from a store near the site where the ATV was located, placed them on the sides of the ATV and drove the ATV for 25 minutes, measuring the temperature every five minutes. (Burleson Depo. pp. 94-96, 101, Burleson Report ¶ V ).  Mr. Burleson admits that "there was nothing magical about the spot" he chose to place the electronic thermometers, he just "stuck them wherever was quickly appropriate" to get some idea what the temperatures were on the side of the engine. (Burleson Depo. pp. 94, 103).  Clearly, any specific results from this preliminary test are not sufficiently reliable to satisfy a Daubert analysis.  Mr. Burleson concedes that the data obtained from this test were preliminary results that merely led him to conclude that more in-depth testing needed to be completed.  As such, the court finds that the specific preliminary results are not admissible, but that Mr. Burleson's conclusions are not flawed or unreliable on that basis.   Mr. Burleson's opinions were not materially based on the preliminary testing.

On July 9, 2003, a second test was performed at Mr. Burleson's laboratory. Mr. Burleson was not present at the testing. (Burleson Depo. pp. 110, 156). A temperature measurement protocol was performed on both the ATV used by plaintiff and a 1999 Arctic Cat 400 four-wheel drive vehicle. (Burleson Report ¶ V, p. 8). Mr. Burleson's report states that each machine was operated for approximately one hour and thermocouples were used to measure temperatures inside and outside the right and left boot of an operator for approximately one hour while pulling the Bush Hog used by plaintiff. (Burleson Report ¶ V, p. 8). However, the data sheet from the test indicates that while the Arctic Cat was tested while running for 2985 seconds (approximately 50 minutes), the incident ATV was run and tested for 3585 seconds (approximately 60 minutes). (Doc. 136, Ex. 25 - data sheet). The thermocouple on the inside of the left boot malfunctioned during the test of both vehicles. (Burleson Report ¶ V, p. 8). Testing of the ATV indicated that the highest temperature outside the left boot, adjacent to the engine, was 232.8 degrees Fahrenheit, the highest temperature inside the right boot was 127.7 degrees Fahrenheit, and the highest temperature on the exterior of the right boot was 171.3 degrees Fahrenheit. (Burleson Report ¶ V, p. 8; Doc. 136, Ex. 31 - test data summary). The Arctic Cat vehicle, which had a water-cooled engine, produced exterior boot temperatures up to 130 degrees Fahrenheit and interior boot temperature on the right boot up to 111.7 degrees Fahrenheit. (Doc. 136, Ex. 31 - test data summary). The oil temperature light illuminated on the Arctic Cat vehicle indicating the engine had reached a high temperature. (Burleson Report ¶ V, p. 8). The court notes that the beginning ambient temperature for the incident ATV (93.8º) was more than 10 degrees higher than the beginning ambient temperature for the Arctic Cat (82.6º). The beginning temperatures for the exterior of the boots were also lower for the Arctic Cat, the largest variance being the

exterior right temperature which was 15.7 degrees cooler on the Arctic Cat at the start of the test. The ambient temperature for the incident ATV fluctuated between 87.5 and 108.1, with the average being 96.7. The Arctic Cat ambient temperatures fluctuated between 80 and 102.6 with an average of 90.43.

On September 23, 2003, the testing was repeated on the incident ATV for 7320 seconds (two hours and two minutes). (Doc. 136, Ex. 25 - data sheet). The thermocouples showed that temperatures inside the left boot climbed to 173.3 degrees Fahrenheit, temperatures inside the right boot reached 132.6 degrees Fahrenheit, temperatures outside the left boot reached 155.9 degrees Fahrenheit and outside the right boot reached 152.8. (Burleson Report ¶ V, p. 8). For this test the starting ambient temperature was 80.2, with the highest ambient temperature being 96.1 and the average ambient temperature of 83.6.

Defendants contend that Mr. Burleson's test data and opinions are unreliable for several reasons. Although during the test Mr. Burleson used plaintiff's boots, and socks similar to those worn by plaintiff when he was injured, instead of using a human subject he used the feet and legs of a dummy made of vinyl plastisol with a metal bar in the center of each leg. Defendants claim that the use of the dummy made the tests unreliable because Mr. Burleson offered no explanation or data as to how vinyl plastisol or the metal bar affected the way heat would be conducted, retained, transferred and/or measured. There are obvious safety reasons for using a dummy, rather than a live person to test an allegedly defective product. Using a dummy also eliminates certain potential variances, such as the possibility that a live driver might move his feet during testing. The use of a dummy may be more reliable when comparing temperatures from one machine to another. However, the court agrees that, to the extent the tests were used to

9

determine the temperature to which plaintiff's heels were exposed, the use of a vinyl plastisol dummy with metal rods underneath the legs may have materially skewed the results. Some inquiry or research should have been conducted to determine what effect the material used had on the data obtained. Mr. Burleson has offered no evidence that the material used did not materially effect the temperature readings.

Defendants also contend that the thermocouples were not properly calibrated because they were only calibrated to the freezing point of water rather than the freezing point and the boiling point of water. (Ex. Q, Carter's Rule 26 Disclosure, pp. 6,8).

Defendants also point out that the test performed on September 23, 2003, shows that the temperature inside the left boot was higher than the temperature outside the left boot, next to the engine. Mr. Burleson explained that the reason the temperature outside the boot, next to the engine, was cooler was because:

> It's a matter of BTU buildup, and there's an insulation value that keeps the heat inside there. And it's not losing heat, it's continuing to take on heat BTU's like your car keeps getting hotter and hotter and hotter. When it may not be 140 degrees outside, it can sure be inside your car.

(Burleson Depo. p. 165). However, the results from the left boot are not consistent with the results obtained that day from the right boot, or with the results from the tests performed on July 9, 2003. It is illogical for the temperature to have built up inside the left foot, but not inside the right foot during the testing of either machine.

In addition, Mr. Burleson's conclusion that the Arctic Cat produced significantly lower temperatures is not completely supported by the data. As stated above, testing of the Arctic Cat was stopped at 2985 seconds (approximately 50 minutes) with temperatures inside the right boot reaching 111.7 degrees and temperatures outside the boots reaching as high as 130.1 degrees.

(Doc. 136, Ex. 25 - data sheet).  The test of the incident ATV performed in July 2003 indicated that at 2985 seconds, the interior right foot reached 123.5 degrees and the exterior temperatures reached 156.9 on the right side and 229.6 on the left side.  The test performed in September 2003 indicated that at 2985 seconds, the interior temperature of the left boot reached 127.8 degrees, the interior of right boot reached 104.8 degrees, the exterior left reached 130.1 degrees, and the exterior right reached 134.7 degrees.  Thus, the tests indicate that the interior temperature of the right boot on the Arctic Cat was only about 12 degrees cooler than the incident ATV during the July 2003 test and was in fact 7 degrees warmer than the interior temperature of the right boot during the September 2003 test.  There is no data from the Arctic Cat as to the temperature inside the left boot.  The exterior temperature readings at 2985 seconds indicated that the right boot from the Arctic Cat was 28.1 degrees cooler than the highest temperature reading at that point of the incident ATV during the July 2003 testing, but only 5.9 degrees cooler than the highest reading of the incident ATV at that point during the September 2003 test.

The court also notes that the temperatures spiked up and down continuously during the tests, which Mr. Burleson attributed to the wind. (Burleson Depo. pp. 136, 156).  For instance during the July 2003 test, the exterior left boot temperature reading at 2625 seconds was 217.18.  The next reading, fifteen seconds later was 172.7 - a swing of 44.48 degrees.  Thus, it is difficult to conclude what temperature a driver would be exposed to for any length of time simply by comparing the highest temperatures reached.  Although the exterior temperature on the left side reached as high as 229.6 degrees by 2985 seconds, the average of the last 13 temperature readings, three minutes worth of readings, is 192.8 degrees - almost 37 degrees less than the highest reading.

The data from the September 2003 test indicates that the interior of the right boot did not reach 116 degrees (the temperature at which Mr. Burleson testified skin exposure for 45 minutes could result in third degree burns[3]), until 4155 seconds - one hour and 9 minutes.  According to Burleson, plaintiff ran the ATV for about an hour and 15 minutes on the day of the incident. (Burleson Depo. p. 160).  Thus, according to the September 2003 data, plaintiff's right foot would only have been exposed to that high of a temperature for the last 6 minutes of his ride.  The September 2003 data indicated that at 4500 seconds (one hour and 15 minutes) the highest temperature reached inside the right boot was 118.9 degrees, with the average temperature over the last 6 minutes being 116.8 degrees.   To conclude from this evidence that Mr. Phillip's injury to his right foot was caused by the ATV is speculative.  While the July 2003 test indicated that the interior right boot temperature reached as high as 127.7 degrees, that only exemplifies the unreliability of the test results and indicates the need for additional testing.  Mr. Burleson offered no reason for discounting the September 2003 test over the July 2003 test.  In fact, Mr. Burleson was not even present at the July 2003 testing, but viewed it on videotape and testified that his protocol was followed in July.

The court notes that Mr. Burleson concludes that there are other alternative designs, in addition to the water-cooled engine he tested, which would have prevented or lessened Mr. Phillips' injuries.  Burleson concludes that "proper techniques of machine design, engine cooling, heat dissipation, and thermal guarding were available and could have reduced the temperatures present in the foot well area to safe acceptable levels."  (Burleson Report, ¶ IX).

---

[3] The court notes that defendants also object to Mr. Burleson's testimony regarding the temperature and time required to cause third degree burns.

However, Mr. Burleson did not test such alternatives on the incident ATV.

After a thorough review of Mr. Burleson's report and data, the court finds that Mr. Burleson's conclusions are unreliable based upon the methods used and data obtained.  The court finds that, given the numerous problems and inconsistencies described above,  Mr. Burleson's conclusions do not stem "from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." See Whatley, 166 F.Supp.2d at 1353 (citations omitted).   His testimony is therefore excluded.

## III. Plaintiffs' Evidentiary Submissions

The court will disregard plaintiffs' evidentiary submissions to the extent the court has found above that such evidence is due to be stricken.

## IV. Plaintiffs' Statement of Disputed Facts

Defendants object to plaintiffs' separate response to defendants' statement of facts. Plaintiffs filed a statement of disputed facts in addition to their brief in opposition to summary judgment.  Defendants contend that plaintiffs, by filing the statement of disputed facts, have essentially doubled their page limit allowed under the local rules.  As such, defendants contend they are unable to sufficiently respond to plaintiffs' pleadings within their allotted page limit. However, the court finds that defendants have fully responded to plaintiffs' pleadings by filing, in addition to the reply, two motions to strike plaintiffs' evidence.  Moreover, the court finds that striking plaintiffs' statement of disputed facts would not result in a different outcome. Therefore, the court finds that defendants' motion to strike plaintiffs' statement of disputed facts

is **MOOT**.

**V. Summary Judgment Motion**

    **A. Summary Judgment Standard**

    Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249. (internal citations omitted).

    The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank

& Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B. Plaintiff Deda Phillips

Defendants contend that summary judgment should be granted as to plaintiff, Deda Phillips, because, although she is named as a plaintiff in the style of the complaint, she has asserted no claims or injuries herself. Plaintiffs have not denied this contention. The court, after review of the complaint, likewise finds no indication that Deda Phillips is asserting any claim. Accordingly, summary judgment is due to be granted in favor of defendants as to Deda Phillips.

### C. Plaintiff Richard Phillips

Plaintiff alleges that the Honda ATV "was in a defective condition and was not reasonably safe for its intended uses." (Doc. 1, ¶ 12). Such allegations would support a claim

under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). To establish

liability under AEMLD, plaintiffs must show:

> "[1] that an injury was caused by one who sold a product in a defective condition
> that made the product unreasonably dangerous to the ultimate user or consumer;
> [2] that the seller was engaged in the business of selling such a product; and [3]
> that the product was expected to, and did, reach the user without substantial
> change in the condition in which it was sold. " Tillman [v. R.J. Reynolds Tobacco
> Co.], 871 So.2d [28, 31 (Ala. 2003)](emphasis omitted, quoting Bell v. T.R.
> Miller Mill Co., 768 So.2d 953, 957 (Ala. 2000)).

Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1193 (11th Cir. 2004).   The court

finds that plaintiffs have not presented sufficient evidence for a jury to find that plaintiff's injury

was caused by the incident ATV.  Plaintiffs have offered no competent expert testimony that the

alleged injury was caused by a product manufactured, designed, or sold by defendants.

Disregarding the evidence stricken above, the court finds the following facts:  On

September 7, 2001, plaintiff drove the incident ATV, while pulling a Bush Hog  mower.  That

evening, while taking his boots off, plaintiff noticed some sores or ulcers on his heels and sought

medical attention from a physician, Dr. Judy Travis, who lived nearby.  Plaintiff told Dr. Travis

that he had burned his feet while riding an ATV earlier that day.   According to Dr. Travis, the

sores on plaintiff's feet appeared to be consistent with what plaintiff had told her - - that they

were burns.  Plaintiff was later treated by other physicians and a therapist who also described the

sores as being consistent with burns.  However, plaintiff has a history of injuries to his feet

which included ulcers caused from friction while wearing boots for an extended period of time.

The injuries sustained on September 7, 2001, are consistent with ulcers caused by friction and

the treatment of plaintiff's injured feet would have been the same regardless of the cause.

It is not known what temperature the foot area of the incident ATV reached while

plaintiff rode it on September 7, 2001. Plaintiff had considerable experience riding ATVs and

was aware that the engines on ATVs get hot during use.  Plaintiff did not notice that day that the

engine had become excessively hot - he has no feeling in his feet and apparently did not notice

excessive heat on his legs or any other part of his body.  Plaintiff's boots were not damaged and

16

there is no other evidence to indicate that the ATV got hot enough to burn plaintiff.

Plaintiff argues that under Goree v. Winnebago Industries, Inc., 958 F.2d 1537 (11th Cir. 1992), expert testimony is not necessary for a jury to find that the injury was caused by the alleged defective product.   In Goree, the plaintiff was a paraplegic who had installed hand controls on his Chieftain motor home.  That plaintiff alleged that his feet were burned when the floorboard of the motor board became hot while he was driving.  An expert testified as to what level of temperature would cause burn injuries to a person's foot if exposed for a sufficient amount of time. Id. at 1541.  There was evidence that the temperature above the floorboard where plaintiff's feet rested was more than sixty-five degrees above that which would normally cause burn injuries.  The court found that lay jurors, without the aid of additional testimony, could reasonably find that the motor home was defective ; it was unnecessary for the jurors to know what caused the temperature to be so high. Id. at 1542.

The court finds that the Goree case is not analogous to the instant case.  The court agrees that expert testimony is not necessary to demonstrate what caused the alleged high temperatures. However, there must be sufficient testimony to show that the ATV produced high enough temperatures for a sufficient length of time to cause the alleged injury.  In this case, there is some question whether the injury suffered by plaintiff is even a burn.  Mr. Phillips' treating physicians testified that the injury was consistent with a burn, but the injury could also have been caused by something other than excessive heat.  "Proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." Bishop v. Bombardier, Inc., – F. Supp. 2d –, 2005 WL 3068320, *5 (M.D. Ga. Nov. 16, 2005)(citing Ex parte Mobile Power & Light Co., Inc., 810 So.2d 756, 760 (Ala. 2001)).

Even if there was sufficient evidence for a jury to find that Mr. Phillips sustained an injury from the incident ATV, plaintiffs must also prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the product. Richards v. Michelin

Tire Corp., 21 F.3d 1048, 1056 (11th Cir. 1994)(citations omitted).  "This is true whether plaintiffs' defective design claim arises from AEMLD, negligence or wantonness." Conally [v. Sears Roebuck & Co.], 86 F.Supp.2d [1133] at 1137.  "No matter which theory a plaintiff proceeds under, he must prove a safer alternative design." Id. (citations omitted).

The installation of a heat shield, a device which has been utilized on motorcycles, might have lessened the temperature.  However, such devices were not tested on the incident ATV or similar machines under the same or similar circumstances presented here.  Thus, it is unknown whether a heat shield would have significantly lowered the temperature and prevented or lessened plaintiff's injuries in this case.  A fan could also have been installed on the incident ATV; however, like the heat shield, there has been no evidence presented to document its effectiveness.  Likewise, there is no evidence that a water-cooled engine would have  result in significantly lower temperatures by plaintiff's feet.  Plaintiffs have presented no admissible evidence of an alternative design that would have significantly lowered the risk of burn to plaintiff.

Plaintiffs' AEMLD claim fails, as does plaintiffs' negligence, wantonness and warranty claims, because plaintiff has failed to present sufficient evidence for a jury to find that the ATV was defective or unreasonably dangerous, that the alleged defect caused Mr. Phillips' injuries, or that an alternative design would have alleviated the alleged defect.

## CONCLUSION

For the reasons stated above, the court **ORDERS** as follows:

1. Defendants' motion to strike the testimony of Dr. Judy Cooke Travis, Dr. Donald Charles Gross, Dr. William Debell, Dr. Thomas D. McDermott, and Don Sprewell (Doc. 141) is **GRANTED**;

2. Defendants' motion to exclude the testimony of Michael A Burleson (Doc. 143) is **GRANTED**;

18

3. Defendants' motion to strike plaintiffs' evidentiary submissions (Doc. 146) is **GRANTED IN PART** – the evidence is stricken to the extent the court found that such evidence constituted the expert testimony of Dr. Judy Cooke Travis, Dr. Donald Charles Gross, Dr. William Debell, Dr. Thomas D. McDermott, Don Sprewell, and/or Mr. Michael A. Burleson; the motion is **DENIED** as to the remaining evidentiary submissions listed;

4. Defendants' motion strike plaintiffs' statements of disputed fact (Doc. 147) is **MOOT**;

5. Defendants' motion for summary judgment (Doc. 124) is **GRANTED** in favor of defendants.

**DONE and ORDERED** this 26th day of January, 2006.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE